433 S.E.2d 277

**Larry Delbert REYNOLDS, Plaintiff Below, Appellee,**

**v.**

**Cheryl Lynn May REYNOLDS, Defendant Below, Appellant.**

**No. 21539.**

Supreme Court of Appeals of West Virginia.

Submitted May 11, 1993.

Decided July 16, 1993.

James Wilson Douglas, Sutton, for appellant.

George M. Cooper, Sutton, for appellee.

PER CURIAM.

This is an appeal by Cheryl Lynn May Reynolds from an order of the Circuit Court of Braxton County awarding custody of her infant child to the child's father, the appellant's former husband, Larry Delbert Reynolds. On appeal, the appellant claims that the trial court erred in awarding custody to the child's father. After reviewing the record and the questions presented, this Court agrees. Accordingly, the judgment of the Circuit Court of Braxton County is reversed.

The evidence in this case shows that the appellant and Larry Delbert Reynolds were married in Greenbrier County, West Virginia, on November 16, 1980. They, however, moved to Braxton County shortly thereafter. On March 1, 1984, a son was born to the parties. Initially after the birth, the appellant, who had previously been employed full time, returned to employment on a part-time basis so that she could care for the child. In June, 1986, she returned to work on a full-time basis.

Over the next several years, the parties lived together with the child and enjoyed a relatively normal home life. In spite of this, on October 24, 1991, Larry Delbert Reynolds initiated a divorce proceeding against the appellant. In his complaint, he sought, among other things, custody of the couple's child, who was then seven and one-half years old. In her answer to Larry Delbert Reynolds' complaint, the appellant also prayed for custody of the infant child.

A *pendente lite* temporary hearing was held on October 28, 1991, and at that hearing custody of the child was temporarily awarded to the appellant, pending final disposition of the questions in the case by the family law master.

Hearings were subsequently conducted on the question of which party should have custody of the child, and during those hearings Larry Delbert Reynolds moved that the family law master conduct an *in camera* interview with the child, who was then eight years old, to determine his custodial preference. The appellant opposed the interview, and the family law master subsequently refused to conduct the interview.

After taking evidence on the question of custody, the family law master, on June 1, 1992, submitted proposed findings of fact and conclusions of law. In those findings of fact and conclusions of law, the family law master found that the parties had stipulated, and that the evidence showed, that both parties were fit and proper persons to have custody of their infant child. The master also discussed at some length the evidence on who had been the primary caretaker of the child. The master noted that for six weeks after the birth of the child, the appellant had stayed at home to care for him while Larry Delbert Reynolds worked. Over the next two years, the appellant worked part time, and Larry Delbert Reynolds worked full time. From June, 1986, both parties worked full time.

Relating to who was the primary caretaker of the child over these years, the master specifically found that:

[The babysitter's] testimony revealed that the Defendant [appellant] made the majority of arrangements with the babysitter, including delivery, pick up, calling the sitter if either party would be late in retrieving ... [the child], paying the sitter for her services, and providing medications, food, diapers, and toys for ... [the child] for use while at the sitters. As to extracurricular school and religious activities, the Defendant and her witnesses stated that the Defendant participated with ... [the child] in the same much more than did the Plaintiff [Larry Delbert Reynolds]. These activities included school holiday parties and parades for the school children, school birthday parties for ... [the child], and vacation bible school. Further, as to initial contacts with school authorities, the Defendant produced certain documents (i.e., consent forms) which corroborated her testimony

that for the most part she, and not the Plaintiff, made such initial contacts. Also, even as to regular church attendance, the Defendant was in attendance with ... [the child] more than the Plaintiff was in such attendance (apparently due to the Plaintiff having to work on certain Sundays). The Defendant's testimony in this regard was corroborated by several witnesses, which witnesses were called to testify by both parties.

When ... [the child] would become sick at school, the school authorities called the Defendant, and the Defendant would then at times have to leave work.... One of the Plaintiff's witnesses even corroborated the Defendant's testimony in this regard.

At least three evenings of each week, the Plaintiff worked past ... [the child's] bed time. During these evenings, the Defendant cared for ... [the child] and put him to bed.

At certain annual picnics and gatherings through the Defendant's employment, the Defendant and ... [the child] participated in the same to a much greater degree than did the Plaintiff. Also related to the Defendant's employment is the testimony of three of the Defendant's coworkers who stated that on several occasions ... [the child] was at the Defendant's place of employment, primarily ... after school hours. Consistent with this testimony, the Defendant stated that she picked up ... [the child] from school and brought him back to work until her shift ended.

\*    \*    \*    \*    \*    \*

Although the Plaintiff claimed that he did almost all of the parties' grocery shopping due to his convenience of working at Kroger's, the Defendant presented countless canceled checks written in varying amounts and varying dates over several years written by her to Kroger's.

From the totality of this evidence, as well as other evidence introduced, the master concluded that the appellant had been the primary caretaker of the child and suggested that under the law custody of the child should be awarded to her, subject to the right of reasonable visitation in Larry Delbert Reynolds.

Larry Delbert Reynolds took issue with the family law master's findings and claimed before the Circuit Court of Braxton County that the family law master had erred by failing to conduct an *in camera* interview with the child to determine his custodial preference.

The Circuit Court of Braxton County, after taking the family law master's findings under consideration, as well as considering Larry Delbert Reynolds' objections to the findings, determined that the parties' child should be interviewed by a psychologist for the purpose of determining whether he could discuss his custodial preference and his rationale for the preference.

The psychologist interviewed the child, as well as the parties, and concluded that the child was capable of expressing a custodial preference and a rationale for the preference.

After learning of the psychologist's findings, the circuit court scheduled a hearing for the purpose of eliciting from the child a statement of his custodial preference and his rationale for that preference. At the hearing, the child, who since the initiation of the proceedings had moved with the appellant back to Greenbrier County from Braxton County, stated that he "... was not too happy with the Greenbrier County schools and that the same did not compare to the Braxton County Schools, and further that ... [he] was not too happy with the boyfriend of the [appellant]."

After obtaining the child's statement, the circuit court, notwithstanding the findings of the family law master regarding the primary caretaker status of the appellant and the fact that she was a fit parent, rejected the master's conclusions and recommendations and awarded permanent custody of the child to Larry Delbert Reynolds, the child's father. It is from that custody award that the appellant now appeals.

■ In *Garska v. McCoy,* 167 W.Va. 59, 278 S.E.2d 357 (1981), this Court examined the factors which a trial court should consider in determining which of a minor child's parents should have custody of that

child as a result of a divorce proceeding. In syllabus point 6 of *Garska*, the Court concluded:

In a divorce proceeding where custody of a child of tender years is sought by both the mother and father, the court must determine in the first instance whether the primary caretaker is a fit parent, and where the primary caretaker achieves the minimum, objective standard of behavior which qualifies him or her as a fit parent, the trial court must award the child to the primary caretaker.

In spite of this rule, the Court has recognized that if a child is of the age of discretion, he or she should be consulted and due weight should be given to his or her wishes in the matter of custody and care. *State ex rel. Kiger v. Hancock*, 153 W.Va. 404, 168 S.E.2d 798 (1969); *see J.B. v. A.B.*, 161 W.Va. 332, 242 S.E.2d 248 (1978). The Court has also said that the age of discretion is generally fourteen, although in syllabus point 7 of *Garska v. McCoy, supra*, the Court pointed out:

... Where there is a child under fourteen years of age, but sufficiently mature that he can intelligently express a voluntary preference for one parent, the trial judge is entitled to give that preference such weight as circumstances warrant, and where such child demonstrates a preference for the parent who is not the primary caretaker, the trial judge is entitled to conclude that the presumption in favor of the primary caretaker is rebutted.

In *Rose v. Rose*, 176 W.Va. 18, 340 S.E.2d 176 (1985), this Court further examined the question of the weight to be given to a child's preference when the child was under the age of discretion. In that case, the Court recognized that it was appropriate for a trial judge to conduct a private interview with the child outside the presence of the parties and counsel for the purposes of examining the child's wishes.

In note 4 of *Rose v. Rose, Id.*, the Court offered guidelines for trial courts to follow during such examinations. That note states, in part:

As already discussed, an inquiry should be made into the child's intelligence and maturity to see if the child's choice was intelligently made. Equally important, however, is the child's rationale for his decision. In order to be accorded weight, a child's preference for one parent over the other ought to be based on good reason ... In making its examination of the child, the trial court should try to explore several aspects of the child's decision. We offer the following guidelines to the trial court as to areas which may have an effect on the weight placed on the child's decision:

1. The trial court should give greater weight to the wishes of a child which are expressed with strength, clearness, or with great sincerity....

2. A child's preference should be given less weight where it appears that the preference is based on a desire for less rigid discipline or restraint....

3. The trial court should investigate whether the statement of preference by the child was induced by the party in whose favor the preference was expressed. If so, said statement of preference should be accorded little, if any, weight....

4. Where an otherwise intelligent child makes an illogical decision based on unimportant factors, the trial court may disregard the child's statement of preference....

Finally, in *Rose*, the Court suggested the advisability of the trial court's making of a record of the court's interview with the child and the court's permitting the parties to have access to the record by way of an accurate or verbatim summary.

It appears that in the present case the trial court did take steps to ascertain the ability of the parties' eight-year-old child to make a mature selection of a custodian parent. The court had the child evaluated by a licensed psychologist, who also interviewed the parties. The licensed psychologist concluded that the child was of sufficient maturity to express a desire as to his custodial parent.

After conducting the interview with the child, the court summarized for the parties what the child said. The court's summary proceeded as follows:

[I]t was apparent said ... [child] wanted to return to Braxton County from Greenbrier County and preferred to live with his father.... The court further noted that said ... [child] was not too happy with the Greenbrier County Schools and that the same did not compare to the Braxton County Schools, and further that ... [the child] was not too happy with the boyfriend of the Defendant....

The court also noted that there was no evidence of any influence being brought upon the child by either of the parties and that the child was concerned about the injured feelings that the appellant would suffer from his desire to return to Braxton County to live with his father.

■ As indicated in the authorities cited, the clear preference of the law in West Virginia is that custody of an infant child be placed with the primary caretaker, provided the primary caretaker is a fit and proper person to have custody of the child. Some substantial showing is necessary to overcome this fundamental preference.

■ Although a mature and intelligently made expression of preference by a child may be accorded weight in overcoming the primary caretaker presumption, *Rose v. Rose, supra,* indicates that for the child's preference to be accorded weight, the preference must be based on some good reason.

■ The record of the present case adequately demonstrates that the appellant is a fit and proper person to have care and custody of the child and that she has heretofore been his primary caretaker. Further, the apparent reasons assigned by the child in this present case are that the child preferred to live in Braxton County rather than Greenbrier County, that he was not too happy with the Greenbrier County schools, and that he was not too happy about the appellant's boyfriend. As previously indicated, the record shows that the child was eight years old at the time he expressed the preference, and it further shows that he had rather recently been relocated from Braxton County to Greenbrier County.

In this Court's view, the factors assigned by the child for the basis of his preference are relatively unimportant and may very well be as simple expression of temporary dissatisfaction with a recent move.

Given the overall circumstances of the case, the fact that the record establishes that the appellant was the primary caretaker, the fact that there is no showing that she is or was an unfit parent or unfit to have custody, and given the fact that the child was eight years old at the time he expressed his preference and that he based his preference on what this Court considers to be relatively unimportant factors, this Court concludes that the trial court erred in overruling the family law master's findings and in awarding custody of the infant child to the appellee, Larry Delbert Reynolds.

For the reasons stated, the judgment of the Circuit Court of Braxton County is reversed, and this case is remanded with directions that the appellant, Cheryl Lynn May Reynolds, be awarded custody of the infant child involved in this proceeding.

The Court notes that the appellee has apparently been a fit and caring father and that the circumstances suggest that he should be awarded liberal visitation rights. The circuit court is, therefore, directed to award him such rights in conjunction with the basic custody award to the appellant.

Reversed and remanded with directions.